UNITED STATES COURT OF APPEALS
**Filed 7/19/96**
FOR THE TENTH CIRCUIT

UNITED STATES OF AMERICA,

       Plaintiff-Appellee,

v.

ROBERT SEALANDER,

       Defendant-Appellant.

No. 95-6002
(D.C. No. CR-93-128-C)
(W.D. Okla.)

UNITED STATES OF AMERICA,

       Plaintiff-Appellee,

v.

RONALD E. VEATCH,

       Defendant-Appellant.

Nos. 95-6017
&
95-6018
(D.C. No. CR-93-128-C)
(W.D. Okla.)

ORDER AND JUDGMENT[*]

---

[*]    This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. The court generally disfavors the citation of orders and judgments; nevertheless, an order and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3.

Before ANDERSON, LOGAN, and MURPHY, Circuit Judges.[**]

Defendants Ronald Veatch and Robert Sealander were jointly prosecuted for operating a telemarketing business which defrauded a federally insured financial institution. Mr. Veatch was found guilty of fraud and making false statements to a federally insured financial institution, conspiracy to commit bank fraud, bank fraud, fraudulent use of a social security number, and money laundering. Defendants now directly appeal their convictions and sentences.

I. Background

Mr. Alvin Dion, a resident of Los Angeles, California, became an acquaintance of Defendants Ronald Veatch and Robert Sealander. Mr. Dion's health deteriorated significantly in July 1990 due to a terminal illness. Mr. Sealander, who had access to Mr. Dion's apartment during this time, testified that he was aware of conversations between Mr. Dion and Mr. Veatch about starting a business together. Messrs. Veatch and Sealander had been in business ventures together prior to this time.[1] Mr. Sealander further testified that he

---

[**] After examining the briefs and appellate record, this panel has determined unanimously that oral argument would not materially assist the determination of this appeal. See Fed. R. App. P. 34(a); 10th Cir. R. 34.1.9. The case is therefore ordered submitted without oral argument.

[1] Although two witnesses testified that Mr. Sealander had told them he had had prior
(continued...)

2

suggested to Mr. Dion that he should legally formalize the business arrangement and that he knew a power of attorney had been executed between Mr. Dion and Mr. Veatch under which Mr. Veatch could use Mr. Dion's name.

In August 1990 Mr. Veatch applied for and obtained an Oklahoma identification card using the name and birth certificate of Mr. Dion. On October 5, 1990, Mr. Veatch obtained an Oklahoma driver's license using Mr. Dion's name. Mr. Dion died in the State of Washington on October 10, 1990. Mr. Sealander and his unidentified roommate expressed their condolences in a letter to Mr. Dion's sister dated the day before he died. They stated in the letter that, as Mr. Dion requested, "Social Security has been notified as well as all of what remained of his credit cards and other business type affairs have been canceled." (R., vol. IV at 733-34). In the letter, Mr. Sealander did not mention the power of attorney arrangement or the business relationship between Messrs. Dion and Veatch.

On October 9, 1990, Mr. Veatch applied for a credit card merchant account in Mr. Dion's name at Security National Bank in Norman, Oklahoma [Security National Bank].[2]

_____

[1](...continued)
business ventures with Mr. Veatch, Mr. Sealander testified that he had not had prior business ventures with Mr. Veatch.

[2]     In the association of banks which process Visa/Mastercard transactions, there are both issuing banks and merchant banks. The issuing banks contract with cardholders, issuing them cards and billing them. The merchant banks contract with merchants who accept credit card payment for goods and services. When a merchant makes a credit card sale, he can either electronically deposit the amount of the sale into his account at the merchant bank or physically deposit the credit sales slip generated by the sale. The merchant then gains
(continued...)

The merchant account allowed Mr. Veatch to accept credit card charges for a new travel agency business he claimed he was starting in Oklahoma City called Al Dion Enterprises [Dion Enterprises]. Using the false identification card, the false driver's license, and Mr. Dion's social security number, Mr. Veatch represented that he was Alvin Dion in opening the merchant account at Security National Bank. He originally wanted to run his business using a post office box, but Security National Bank refused to approve the merchant account application until the business had a commercial store front.

Mr. Veatch signed a lease for office space and began operating Dion Enterprises with the assistance of his brother, who was using the name Roger Goldberg, and his sister-in-law, Jamie Farris. On November 23, 1990, an employee of Security National Bank viewed the store front of the business and examined a list of travel agency services to be provided by Dion Enterprises. Security National Bank approved the application after obtaining an acceptable credit check.

---

[2](...continued)
immediate access to Visa/Mastercard funds equal to the amount of the credit sale deposit even though it may be thirty days before the cardholder is billed by the issuing bank for the sale.

In the event that the cardholder disputes a sale, the merchant must verify the sale with either a credit sales slip signed by the cardholder or similar documentation if the transaction was conducted over the telephone. If the merchant is unable to verify it, the issuing bank credits the cardholder's account and charges the amount of the sale back to the merchant bank. The merchant bank then debits the merchant's account. If there are insufficient funds in the merchant's account to cover the debit, the merchant bank is liable to Visa/Mastercard for the amount of the debit.

Also in November 1990, Mr. Veatch called Mr. Sealander in Los Angeles and discussed the business he was setting up. Mr. Sealander agreed to travel to Oklahoma to assist Mr. Veatch in setting up a computer program to process the sales, shipping, and credit card information. Mr. Veatch sent him a check, dated November 29, 1990, and signed by "Al Dion" for transportation and hotel accommodations. In January 1991 Mr. Sealander went to Oklahoma City to begin work for Dion Enterprises. At that time he observed Mr. Veatch using Mr. Dion's name. Eventually, Mr. Sealander took on the role of managing the day-to-day operations of Dion Enterprises. A former employee of Dion Enterprises testified that Mr. Sealander was the manager of Dion Enterprises. Using "R. J. Sealander," Mr. Sealander signed a real estate lease on behalf of Dion Enterprises for additional office space, he purchased and leased business equipment, and he hired employees.

According to an employee, Dion Enterprises operated as a fulfillment center. Telemarketing clients would fax it the pertinent information of each sale the client made: the customer's name, address, and phone number, credit card type, and number and the purchase price amount. Mr. Goldberg would process the credit card number, and data entry employees would enter the information into a computer system. Then employees would call the customers and reverify the sale. The office had a shipping and receiving area where the travel packages that were sold were put together.

On January 29, 1991, Mr. Veatch again posed as Mr. Dion and opened a business checking account for Al Dion Enterprises at Central Bank in Oklahoma City [Central Bank].

5

The signature card listed Al Dion or R. J. Sealander, d/b/a Dion Enterprises; it was signed "Al Dion" by Mr. Veatch and by Mr. Sealander using "R. J. Sealander." Mr. Sealander testified that although he normally did not sign his name using initials, the signature appeared to be his, but he did not remember signing the card. The account was opened with the deposit of a $3,000 check from Security National Bank. On February 13, 1991, Central Bank received a wire deposit of $4,000 from Security National Bank into the Dion business account; a second $4,000 wire deposit was made February 14, 1991. One of the $4,000 wire transfers was authorized by "Al Dion" and the other by "Bob Sea." Some of the funds withdrawn from the Central Bank account were used to pay the commercial rent for Dion Enterprises, to pay the salaries of employees hired to process sales data, and to pay miscellaneous business expenses.

Soon after opening the merchant account for Al Dion Enterprises, Security National Bank noticed an unusually large number of "chargebacks" to the account.[3] Tim Black, a former Dion Enterprises' employee, testified that Mr. Sealander told him refunds on chargebacks were paid by check so the bank would not begin to wonder why there were so many chargebacks. Mr. Black also testified that he personally notified Mr. Sealander that

---

[3] A "chargeback" occurs after a credit card customer cancels an order made under their credit card number, and the merchant bank must charge back to the merchant account for the canceled amount. Chargebacks in this case occurred when credit card customers complained that the charges against their accounts were never authorized or that promised goods were not delivered as promised. The credit card holders were automatically entitled to refunds because the fraudulent sales were generated by telephone rather than in person.

multiple charges were being made to the same credit card under the same name as well as to the same card under different names. Mr. Sealander testified that he was aware that duplicate charges were being made to the same credit card numbers. Mr. Black suggested an easy and inexpensive means of preventing the duplicate billing of credit card accounts, but Mr. Sealander rejected the idea. Bank officers at Security National Bank became alarmed after the appearance of approximately $151,400 in chargebacks from fraudulent credit card sales, and they closed the Dion Enterprises merchant account on February 15, 1991.

Mr. Veatch scheduled a meeting with bank personnel to discuss the matter, but he did not appear for the meeting. After Security National Bank terminated the merchant account, Dion Enterprises vacated its office space without giving notice. Mr. Sealander had computer equipment removed from the business premises so that the bank could not seize it. Security National Bank ultimately sustained a loss of approximately $96,000, and never heard from Dion Enterprises again. The ending balance of the Dion Enterprises account at Central Bank was $8.91.

Messrs. Veatch and Sealander were eventually arrested by the FBI near Ft. Worth, Texas.[4] When arrested, Mr. Veatch had in his possession credit cards bearing the name D.W.

---

[4] Testimony about the arrest of Mr. Veatch and his fraudulent banking activities in Texas was limited by the court to the government's case against Mr. Veatch. The fact that Messrs. Veatch and Sealander were arrested together in Texas was presented to the jury by Mr. Veatch when he ignored a court order not to mention it. (R., vol. III at 501-02, 545-46). Upon the objection of Mr. Sealander, the court gave a corrective instruction to the jury not to consider that fact in the case against Mr. Sealander.

(continued...)

7

Franklin, and he was using the name Wesley Franklin. Also, the government discovered that Mr. Veatch had opened business accounts at Texas banks using an Oklahoma driver's license bearing D.W. Franklin's name.

Messrs. Veatch and Sealander were indicted on June 16, 1993. Mr. Veatch was charged with fraud and making false statements to a federally insured financial institution, conspiracy to commit bank fraud, bank fraud, fraudulent use of a social security number, and money laundering. Mr. Sealander was charged with conspiracy to commit bank fraud, bank fraud, and money laundering.

On July 19, 1993, the government requested that Mr. Veatch undergo a competency evaluation. Mr. Veatch was examined by government experts at the Federal Medical Center in Springfield, Missouri, and later by a private court-appointed psychiatrist, Dr. John Smith in Oklahoma City. A competency hearing was held December 8, 1993, and the district court concluded that Mr. Veatch was incompetent to stand trial. United States v. Veatch, 842 F. Supp. 480, 482 (W.D. Okla. 1993). Mr. Veatch underwent additional observation after he was transferred to the Federal Medical Center in Rochester, Minnesota. A second report on his competency was issued, this time by Dr. Mary Alice Conroy. Dr. Smith reviewed Dr. Conroy's report and interviewed Mr. Veatch again in late April 1994. After a second

_____

[4](...continued)

8

competency hearing on May 2, 1994, the district court found Mr. Veatch competent to stand trial after hearing testimony from Drs. Conroy and Smith.

Messrs. Veatch and Sealander were tried jointly. Mr. Veatch represented himself at trial, with Thomas McCormick, Esq., appointed by the court as standby counsel. At his trial, Mr. Veatch never denied doing business under the assumed name of his friend, Al Dion. He stated that he used an assumed name because he was trying to escape persecution and harassment from the federal government. He claims that Al Dion had given him power of attorney but that the documents proving this had been stolen from him while he was confined in the Oklahoma County Jail.

The trial commenced September 12, 1994, and concluded September 19, 1994. During the second day of the jury's deliberations, the jury sent the judge a note indicating that it was hopelessly deadlocked on some of the counts. Over Mr. Sealander's objection, the court gave the jury an Allen instruction. Approximately one hour later, the jury returned its verdicts.

Mr. Veatch was found guilty as charged. He was sentenced to 168 months imprisonment, five years supervised release, and he was ordered to pay restitution to Security National Bank in the amount of $96,572.99.

Mr. Sealander was found guilty of bank fraud, not guilty of conspiracy to commit bank fraud, and not guilty of money laundering. Mr. Sealander was sentenced to twenty-one

months imprisonment, three years supervised release, and he was ordered to pay $96,572.99 restitution to Security National Bank.

On appeal Mr. Sealander raises four issues: (1) whether his conviction was supported by sufficient evidence; (2) whether the district court erred in refusing to instruct the jury on Defendant's defense theory; (3) whether the district court unconstitutionally coerced the jury's verdict using the <u>Allen</u> instruction; and (4) whether the district court erred at sentencing by imposing restitution in excess of the amount lost.

Appellate counsel made an appearance for Mr. Veatch and filed a brief. Mr. Veatch's counsel raises ten issues on appeal: (1) whether the district court erred in finding Mr. Veatch competent to stand trial; (2) whether Mr. Veatch's decision to represent himself was made knowingly and voluntarily; (3) whether the court erred by failing to inquire about a complaint by a juror concerning the deliberation proceedings; (4) whether the court unconstitutionally removed Mr. Veatch from the courtroom during sentencing; (5) whether the court erred in imposing a two-level increase in Mr. Veatch's sentence for obstruction of justice; (6) whether the court improperly ordered Mr. Veatch to pay restitution because of his inability to pay; (7) whether the court erred in not allowing Mr. Veatch to present a defense; (8) whether sufficient evidence supported the money laundering charge; (9) whether the trial judge should have disqualified herself; and (10) whether the court erred in failing to suppress evidence. Soon after Mr. Veatch's appellate counsel filed his brief, we granted Mr. Veatch's request to dismiss his counsel and permit him to proceed pro se. Mr. Veatch filed an

independent pro se brief raising fifty additional issues for us to consider. First, we will address the issues raised in Mr. Veatch's counseled brief because they duplicate issues that he raises in his pro se brief. Then, we will separately address other issues raised in Mr. Veatch's pro se brief.

II. Defendant Sealander's Conviction for Bank Fraud

Defendant Sealander asserts that the evidence of intent to defraud a financial institution was insufficient to support his conviction under 18 U.S.C. §§ 1344(1), 2(b). Sufficiency of the evidence is a question of law which we review de novo. United States v. Markum, 4 F.3d 891, 893 (10th Cir. 1993). Evidence is sufficient to support a conviction if, viewed in the light most favorable to the government, the evidence allows a rational trier of fact to conclude that the government proved the essential elements of the crime charged beyond a reasonable doubt. Id. Issues of credibility are within the jury's province, and it may "draw reasonable inferences from basic facts to ultimate facts." Jackson v. Virginia, 443 U.S. 307, 319 (1979).

Title 18 U.S.C. § 1344 provides in relevant part, "Whoever knowingly executes, or attempts to execute, a scheme or artifice-- (1) to defraud a financial institution . . . shall be fined not more than $1,000,000 or imprisoned not more than 30 years, or both." As defined by Congress, "[T]he term 'scheme or artifice to defraud' includes a scheme or artifice to deprive another of the intangible right of honest services." 18 U.S.C. § 1346. Mr. Sealander

11

was also prosecuted under 18 U.S.C. § 2(b), which provides, "Whoever willfully causes an act to be done which if directly performed by him or another would be an offense against the United States, is punishable as a principal." Thus, in this case the government had to prove beyond a reasonable doubt that Mr. Sealander knowingly executed or attempted to execute the scheme charged, or that he willfully caused its execution with the intent to defraud the bank.

The evidence showed the following: Mr. Sealander was aware of the business from its beginnings; he had prior business ventures with Mr. Veatch; he knew Mr. Veatch was using Mr. Dion's name after he had died; he managed Dion Enterprises and knew about overbilling on the credit cards charged at Security National Bank; and he signed a signature card at Central Bank, leases, and a wire transfer. In short, the record is replete with evidence that Mr. Sealander had the necessary criminal intent and, in fact, participated in a scheme to defraud Security National Bank. Thus, sufficient evidence supported the jury's finding that Mr. Sealander was guilty of bank fraud.

III. Defendant Sealander's Jury Instruction on the Defense Theory

Defendant Sealander claims the trial court erred in refusing to instruct the jury on his defense theory which concerned the issue of intent. We review jury instructions as a whole de novo. A criminal defendant is entitled to an instruction on any defense theory finding support in the evidence and the law, and failure to so instruct is reversible error. United

States v. Fox, 902 F.2d 1508, 1516 (10th Cir.), cert. denied, 498 U.S. 874 (1990). Still, trial judges have considerable discretion in tailoring and formulating jury instructions. Id. (citations omitted). Although the trial court does not have to use the exact wording of the instruction tendered by the defendant, the instructions must correctly state the law and fairly and adequately cover the issues presented. Id. (citations omitted). We are satisfied that, considering the instructions as a whole, the jury was adequately instructed and took Mr. Sealander's defense into account.

Defendant Sealander requested the following jury instruction: "You are instructed that mere knowledge that an individual uses a fictitious name to open an account at a bank is insufficient to convict a person of the crime of executing a scheme or artifice to defraud a financial institution." (R., doc. 352) (emphasis added). Mr. Sealander relied upon United States v. Orr, 932 F.2d 330 (4th Cir. 1991), in tendering the jury instruction. The Fourth Circuit held in Orr that the defendant's use of a false name in opening an account upon which he wrote bad checks was not bank fraud in and of itself. Id. at 332. In Orr, the bank suffered no loss, and no evidence was produced showing that the fictitious name was used with the intent to defraud the bank. Also, the Orr court stated that it was focusing on whether a "federal bad check law" was established by 18 U.S.C. § 1344. Orr, 932 F.2d at 332. Orr is clearly distinguishable from this case. Here, Security National Bank was defrauded of more than $96,000 as the result of a complex scheme involving a credit card merchant account under a fictitious name. Evidence--other than the use of the false name--was presented from

13

which a jury could reasonably infer that Mr. Sealander had the intent to defraud Security National Bank. In refusing to give the instruction, the district court said that it did not find the facts of <u>Orr</u> applicable to the fact of this case. We agree. Mr. Sealander's proffered instruction was an incorrect statement of the law. We believe a jury should be able to draw a reasonable inference that Mr. Sealander knowingly executed the scheme to defraud the bank based on his knowledge that Mr. Veatch used Mr. Dion's name to open the merchant account at Security Bank. This reasonable inference was supported by other evidence showing that Mr. Sealander knew Mr. Veatch was misusing the merchant account in Mr. Dion's name.

As explained by the district court, Mr. Sealander's proposed jury instruction was a "matter for argument to the jury" rather than a statement of the law. (R., vol. IV at 704). The instructions given were a complete and accurate statement of the law in relation to the issue of intent. The court's instruction defining intent to defraud states, "To act with an 'intent to defraud' means to act willfully and with the specific intent to deceive or to cheat, ordinarily for the purpose of causing some loss to another, or bringing some financial gain or benefit to oneself." (R., Doc. 370 (Jury Instruction No. 27)). This definition was followed by a good faith defense instruction:

> Willful intent to defraud is an essential element of Count 3 and thus good faith on the part of a defendant is a complete defense. The burden of proving good faith does not rest with the defendants because the defendants do not have any obligations to prove anything in this case. It is the government's burden to prove to you, beyond a reasonable doubt, that each defendant acted with the specific intent to defraud as charged in the Indictment.

14

One who expresses an opinion honestly held by him, or a belief honestly entertained by him, is not chargeable with fraudulent intent even though his opinion is erroneous or his belief is mistaken; and, similarly, evidence which establishes only that a person made a mistake in judgment, or an error in management, or was careless, does not standing alone establish fraudulent intent.

In determining whether or not the government has proven that a defendant acted with an intent to defraud or whether that defendant acted in good faith, the jury must consider all evidence in the case bearing on that defendant's state of mind.

If the evidence in the case leaves the jury with a reasonable doubt as to whether a defendant acted with an intent to defraud, the jury must find that defendant not guilty as to the appropriate charge.

(R., Doc. 370 (Jury Instruction No. 28)). We conclude that the district court properly instructed the jury on the issue of intent to defraud, and the court was correct in refusing to give the tendered instruction.

IV. The Allen Instruction

Defendant Sealander next argues that the district court unconstitutionally coerced the jury's verdict using an Allen instruction after the jury indicated that it was deadlocked on four of nine counts.[5] We review Allen charge issues on a case-by-case basis to determine

---

[5]    The Allen instruction derives its name from jury instructions approved in Allen v. United States, 164 U.S. 492 (1896). The Court described the instruction as follows:

These instructions were quite lengthy, and were, in substance, that in a large proportion of the cases absolute certainty could not be expected; that, although the verdict must be the verdict of each individual juror, and not a mere acquiescence in the conclusion of his fellows, yet they should examine the question submitted with

(continued...)

whether the particular instruction was impermissibly coercive. United States v. Porter, 881

F.2d 878, 888 (10th Cir.), cert. denied, 493 U.S. 944 (1989). As we explained in Porter,

"Some factors considered in making this determination include: (1) The language of the

instruction; (2) its incorporation with other instructions; and (3) the timing of the instruction,

for example, whether given before the jury has commenced deliberations and whether given

before the jury has reached an impasse or deadlock." Id. (citations omitted).

At 3:50 p.m. on its second day of deliberations, the jury sent the court the following

two notes:

> Your Honor, we have reached a consensus on 5 of the 9 counts. We are
> hopelessly deadlocked on 4 of the 9 counts. Any further deliberation would
> serve no purpose.
> . . . .
> The jury would like to know what it can or cannot discuss or reveal to anyone after
> we are dismissed. Also is there a procedure for filing a complaint regarding the
> deliberation proceedings?

---

[5](...continued)
> candor, and with a proper regard and deference to the opinions of each other; that it
> was their duty to decide the case if they could conscientiously do so; that they should
> listen, with a disposition to be convinced, to each other's arguments; that, if much the
> larger number were for conviction, a dissenting juror should consider whether his
> doubt was a reasonable one which made no impression upon the minds of so many
> men, equally honest, equally intelligent with himself. If, upon the other hand, the
> majority were for acquittal, the minority ought to ask themselves whether they might
> not reasonably doubt the correctness of a judgment which was not concurred in by the
> majority.

Id. at 501.

(R., Docs. 372, 373).  Over the objection of Mr. Sealander's counsel, the court provided the

following modified <u>Allen</u> instruction:

> This is an important case.  The trial has been extensive.  Your failure to agree upon
> a verdict will necessitate another trial and require the parties once again to undergo
> the investment of time and effort and the stress of trial.  The Court is of the opinion
> that the case cannot again be tried better or more exhaustively than it has been in [sic]
> either side.  It is therefore very desirable that you should agree upon a verdict.
>
> The Court does not desire that any juror should surrender his or her
> conscientious convictions.  On the other hand, each juror should perform his
> or her duty conscientiously and honestly according to the law and the evidence.
> The verdict to which a juror agrees must of course be his or her own verdict,
> the result of his or her convictions and not a mere acquiescence in the
> conclusions of his or her fellow jurors.
>
> However, in order to bring all minds to a unanimous result, you must examine the
> question submitted to you with candor and with a proper regard in deference to the
> opinion of each other.
>
> You should consider that the case must at some time be decided, that you are
> selected in the same manner and from the same source from which any future
> jury must be and there is no reason to suppose that the case will ever be
> submitted to a jury more intelligent, more impartial or more competent to
> decide it, or that more or clearer evidence will be produced on one side or the
> other.  You may conduct your deliberations as you choose but I suggest you
> now retire and carefully consider again the evidence in the case.

(R., vol. VI at 920-22).  Thereupon, the jury returned to its deliberations.  At 4:50 p.m., the

judge had the bailiff give the jury a note stating, "Please let me know whether further

deliberations would be helpful."  (R., vol VI at 924).  The jury responded with a note from

the foreman stating, "We have completed our deliberations."  (<u>Id.</u>).  The court polled the jury

after the jury provided its verdict finding Mr. Veatch guilty on six of six counts and Mr.

17

Sealander guilty on one of three counts. Each juror responded affirmatively in agreement with the verdict.

The language of the <u>Allen</u> instruction given by the court is very similar to that which we upheld in <u>Porter</u>. <u>See</u> <u>Porter</u>, 881 F.2d at 888 n.14. One difference in the instruction corrected the asserted mistake in <u>Porter</u> that the instruction should not be given in the first person. The other difference is that the court stated, "Your failure to agree upon a verdict will necessitate another trial and require the parties once again to undergo the investment of time and effort and the stress of trial," instead of, "In light of the importance of this case and in light of the fact that it has been a trial of some moderate length and magnitude, your failure to agree on a verdict will necessitate another trial." We do not find this difference in the language of the instructions of any import.

Mr. Sealander also asserts the instruction was unconstitutional because it was not incorporated with other instructions, because it was given as a supplemental instruction after the jury had begun deliberations, and because it was given after the jury indicated that it was hopelessly deadlocked. There is no per se rule that an <u>Allen</u> instruction must be incorporated with other instructions, although it is generally preferable that an <u>Allen</u> instruction be given the jury at the same time as other instructions. <u>United States v. McKinney</u>, 822 F.2d 946, 951 (10th Cir. 1987). It is well-established, however, that a supplemental <u>Allen</u> instruction may be given, <u>Lowenfield v. Phelps</u>, 484 U.S. 231, 237 (1988), and we have "previously emphasized that there is no per se rule against giving an <u>Allen</u> charge after a jury has

commenced deliberations." Porter, 881 F.2d at 889 (citing McKinney, 822 F.2d at 951).

Also, Allen charges given during the course of deliberations are not per se unduly coercive.

See, e.g., McKinney, 822 F.2d at 951 (upholding the instruction when jury reported

agreement on three of thirty-two counts but could not agree on remaining counts). As

evidence of the instruction's coercive effect, Mr. Sealander points to the jury returning its

verdict on the remaining four counts in less than sixty minutes from the time it received the

supplemental instruction. In McKinney the jury returned its verdict on twenty-nine counts

in only an hour and twenty minutes after receiving its Allen instruction. Id. at 950.

We hold that the instruction was not unduly coercive and the instruction was a proper

exercise of the judge's duty to guide the jury.


V. Imposition of Restitution in Excess of the Amount Lost

Defendant Sealander claims the district court committed plain error by imposing

restitution at sentencing, which exceeded the amount of money lost by Security National

Bank. Usually our review of the legality of a sentence of restitution is de novo and factual

findings is for clear error. United States v. Herndon, 982 F.2d 1411, 1420 (10th Cir. 1992).

In this case, however, our review is for plain error because Mr. Sealander's trial counsel

failed to object to the restitution order on this ground. United States v. Wainwright, 938 F.2d

1096, 1098 (10th Cir. 1991). We vacate the restitution order and remand on this issue

because the district court plainly erred by imposing restitution on Defendants Veatch and Sealander in an amount which exceeded the amount lost.

The Victim and Witness Protection Act permits the federal courts to order a defendant at sentencing to make restitution to any victim of the offense. 18 U.S.C. § 3663(a)(1). We have previously explained that the purpose of the Act is "to ensure that victims, to the greatest extent possible, are made whole for their losses." United States v. Arutunoff, 1 F.3d 1112, 1121 (10th Cir.), cert. denied, 114 S. Ct. 616 (1993). Restitution under the Act, however, may not be ordered in an amount greater than the total loss caused by a defendant's conduct. Id. The statute does not explain how multiple defendants are to be treated, but we have explained that courts should either apportion the total loss among the defendants or make the obligation to pay joint and several. Id. at 1121 n.10.

In this case, the district court found that the amount of the loss to Security National Bank caused by the Defendants' bank fraud was $96,572.99. The court then ordered Mr. Sealander to pay $96,572.99 in restitution, and it ordered Mr. Veatch to pay $96,572.99. During Mr. Sealander's sentencing hearing, the court acknowledged that "the bank will not be entitled to recover more than $96,572.99 total." (R., Sealander Sentencing Tr. at 30 (Dec. 19, 1994)). Nevertheless, the court entered restitution orders for $96,572.99 to be repaid by each defendant. Instead, the restitution orders should have reflected either that the Defendants were joint and severally liable for the full amount or they should have proportioned the restitution between the two Defendants. The district court exceeded its

statutory jurisdiction and imposed an illegal sentence when it ordered restitution in an amount greater than the total loss caused by the Defendants' conduct. Thus, the restitution orders in Mr. Veatch's and Mr. Sealander's cases must be vacated and remanded for resentencing.

VI. Mr. Veatch's Competency to Stand Trial

Defendant Veatch asserts that the district court erred in finding him competent to stand trial. We must accept the district court's determination that a defendant is competent to stand trial unless the conclusion is clearly erroneous. United States v. Baca, 687 F.2d 1356, 1361 (10th Cir. 1982). The legal test for competency was set out in Dusky v. United States, 362 U.S. 402 (1960). In Dusky, the Supreme Court held that the competency of a criminal defendant depends on whether he "'has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding--and whether he has a rational as well as factual understanding of the proceedings against him.'" Id. (citation omitted). We must rely heavily on the discretion of the trial court in reviewing the trial court's determination of whether a defendant is competent to stand trial under 18 U.S.C. § 4241(d). United States v. Parsons, 967 F.2d 452, 455 (10th Cir. 1992).

As explained above, the government requested that Mr. Veatch undergo a competency evaluation. He was examined by government medical experts in Springfield, Missouri, and later by a private court-appointed psychiatrist, Dr. John Smith in Oklahoma City. Mr. Veatch

21

was initially deemed incompetent to stand trial in December 1993. See United States v. Veatch, 842 F. Supp. 480, 482 (W.D. Okla. 1993). Mr. Veatch later underwent additional observation. A second report on his competency was issued, and Mr. Veatch was again interviewed by Dr. Smith. After a second competency hearing on May 2, 1994, the district court found Mr. Veatch competent to stand trial.

The issue is whether the government established by a preponderance of the evidence that Mr. Veatch was competent to stand trial on May 2, 1994. The fact that the district court initially found Mr. Veatch incompetent does not mean that it could not subsequently find him competent.[6] See Parsons, 967 F.2d at 455-56.

In the second competency hearing, the district court found Mr. Veatch was competent to stand trial based on the testimony of the government's witness, Dr. Mary Alice Conroy. The court found Dr. Conroy's testimony to be far more in-depth than that of the defendant's expert, Dr. Smith. Dr. Conroy stated that she was able to provide a thorough diagnosis because she had reviewed his entire past record of mental health, and because she had observed him over an extended period of time for twenty-four hours a day. In her testimony, Dr. Conroy explained Mr. Veatch's prior mental examinations and evaluations sufficiently for the court to understand why Mr. Veatch was doing the things that he was doing.

---

[6]     It is noteworthy that in another case where Mr. Veatch was convicted of transporting property obtained by fraud in interstate commerce, he was found mentally competent to stand trial. See United States v. Veatch, 674 F.2d 1217, 1220, 1222-23 (9th Cir. 1981), cert. denied, 456 U.S. 946 (1982).

Dr. Conroy diagnosed Mr. Veatch as having a personality disorder with antisocial and narcissistic features. She testified that it was her opinion--and the opinion of the staff at the Federal Medical Center in Rochester, Minnesota--that Mr. Veatch possessed no mental illness that would impair his contact with reality, that would impair his understanding of the legal process, or that would impair his ability to consult with an attorney.

Mr. Veatch's counsel claims that he has a delusional belief that the government is conspiring against him. Dr. Conroy testified that Mr. Veatch was not delusional. She supported her opinion by stating that a person who is delusional typically does not deny the facts giving rise to the appearance of delusion. The psychiatric records of Mr. Veatch indicate that in the past he did just the opposite of what would be expected if he were truly delusional. Dr. Conroy also testified that a person who is delusional has a fixed set of beliefs, and when confronted with the contradictory evidence, will absolutely and unconditionally defend his beliefs. She then gave two examples of how Mr. Veatch conducted himself in a manner contrary to that of a delusional person. On cross-examination, Dr. Conroy was asked whether she felt Mr. Veatch believed his allegations of government conspiracy, and she answered that she did not believe that he did. She stated that delusional beliefs do not just suddenly appear, but they develop over a period of time. Mr. Veatch's mental health records--including those dating back to Mr. Veatch's 1980 trial in Arizona--do not show a past history of delusional beliefs.

Finally, Dr. Conroy testified that she believed Mr. Veatch was malingering, which she defined as feigning mental illness for secondary gain. She recounted a conversation where Mr. Veatch indicated that he expected the charges against him would be dropped, not because of the alleged government conspiracy but because he expected to be found incompetent as well as nondangerous, thereby resulting in his release from custody in the future. She stated that three other doctors, while diagnosing Mr. Veatch in the past as psychotic, gave a secondary hypothesis of malingering. Also, Dr. Conroy testified that one doctor's primary diagnosis would have changed to malingering if he had known the nature of the pending charges against Mr. Veatch.

Mr. Veatch's counsel also argues that Mr. Veatch's incompetency is evidenced through his presentation at his subsequent trial and in these proceedings. In United States v. Prince, 938 F.2d 1092, 1094 (10th Cir.), cert. denied, 502 U.S. 961 (1991), we explained that it is appropriate to consider, in addition to the medical evidence, the defendant's behavior and demeanor at trial. Mr. Veatch insisted on representing himself, and the district court conducted a Faretta waiver-of-counsel inquiry. See Faretta v. California, 422 U.S. 806 (1975) (See discussion below.). At the waiver hearing, Mr. Veatch stated that he understood the possible punishment in the case was death, saying, "The Nazis will damn sure murder me." He said he anticipated calling approximately 800 witnesses. Then, the district court ordered the presence of stand-by counsel, whom Mr. Veatch repeatedly referred to as a "bozo."

24

Before, during, and after the trial, Mr. Veatch filed dozens of frivolous motions. For example, Mr. Veatch filed several motions requesting court-appointed investigators to investigate his claim of a government conspiracy. In regard to the conspiracy, Mr. Veatch wrote:

> Veatch and Sealander's contention is that this is a Political Malicious Prosecution that involves corruption from the Bush Reagan years that dealt Drugs, Murder, Extortion etc. through controlled and corrupt prosecutors, federal police and federal judges. This prosecution was created to silence Veatch and the alleged law violation was done with the full knowledge of the D.O.J. for CIA, etc. through Sir Run Run Shaw Commander of the British Empire (CBE) which is a front for International Spying dealing in Billions of Dollars in illegal activities.

(R., Doc. 168 at 4). In his appellate pleadings, Mr. Veatch has called the trial judge a "Nazi" and numerous obscene names.

Despite his petulance and obvious contempt of the court, Mr. Veatch did present a cogent defense. Among other arguments, he stated in his opening statement that the whole case boils down to the issue of intent. He told the jury that he had permission to assume Mr. Dion's name; he stated that he opened Dion Enterprises so the company would grow; he stated that the bank was aware that sales would be made by individuals other than Dion Enterprises' employees; that an effort was made to develop a system that would prevent credit card fraud; and that the loss was caused by the bank's action of closing down the account--not by his actions or any of his employees. The record indicates that Mr. Veatch conducted himself as well as or better than any layman would be expected to do under similar

25

circumstances. Also, the court appointed stand-by counsel, which was available to provide legal advice and authority to Mr. Veatch.

The record shows that the district court carefully considered all of the evidence relevant to the issue of Mr. Veatch's competence, and it determined that he was competent to stand trial. The district court's finding was not clearly erroneous.

VII. Mr. Veatch's Waiver of Counsel

Appellant counsel for Mr. Veatch claims that in deciding to represent himself, Mr. Veatch did not knowingly, intelligently, and voluntarily waive his Sixth Amendment right to counsel. The question of whether a waiver of counsel is knowing and intelligent is a mixed question of law and fact which we review de novo. United Sates v. Burson, 952 F.2d 1196, 1199 (10th Cir. 1991), cert. denied, 503 U.S. 997 (1992).

The Sixth Amendment grants a defendant the right to present his own defense. Faretta v. California, 422 U.S. 806, 819 (1975). A defendant must knowingly, intelligently, and voluntarily forfeit his Sixth Amendment right to counsel before electing to represent himself. Id. at 835. "Faretta requires a showing on the record that the defendant who elects to conduct his own defense had some sense of the magnitude of the undertaking and the hazards inherent in self-representation when he made the election." United States v. Padilla, 819 F.2d 952, 956 (10th Cir. 1987). The Supreme Court has explained, "To be valid such waiver must be made with an apprehension of the nature of the charges, the statutory offenses

included within them, the range of allowable punishments thereunder, possible defenses to the charges and circumstances in mitigation thereof, and all other facts essential to a broad understanding of the whole matter." Von Moltke v. Gillies, 332 U.S. 708, 723 (1948). We have made clear "'that the factors articulated must be conveyed to the defendant by the trial judge and must appear on the record so that our review may be conducted without speculation.'" United States v. Allen, 895 F.2d 1577, 1578 (10th Cir. 1990)(citation omitted). Thus, the trial court must inform the defendant on the record of the nature of the charges, the range of allowable punishments and possible defenses, and the risks of proceeding pro se. United States v. Willie, 941 F.2d 1384, 1388 (10th Cir. 1991), cert. denied, 502 U.S. 1106 (1992).

The record shows that there were numerous discussions with Mr. Veatch concerning his decision to proceed pro se. The initial discussion occurred during his arraignment. After a thorough discussion, the magistrate found that Mr. Veatch waived his right to assistance of counsel, and standby counsel was appointed.

During a hearing on May 2, 1994, the trial court queried Mr. Veatch if he wanted counsel appointed at government expense. He replied that he did not want appointed counsel. The court advised him that he could exercise his right of counsel by hiring counsel of his own choosing. The court advised him that he was facing serious charges with a possible sentence of thirty years. Mr. John Coyle, who was Defendant's counsel appointed for purposes of determining competency, was granted a recess to talk with Mr. Veatch. After

27

the recess, Mr. Veatch informed the court that he wanted to represent himself with the assistance of Mr. Coyle as standby counsel. He expressed concern, however, that standby counsel would not maintain attorney-client confidentiality. The court replied that if he elected to represent himself, standby counsel would be appointed, but the selection of Mr. Coyle could not be guaranteed. The court provided a financial affidavit to Mr. Veatch and advised him that he had a week to decide whether he wanted to request court-appointed counsel, to hire counsel, or to waive his right to counsel.

On May 6, 1994, Mr. Veatch filed a pleading in which he cited to Faretta and stated that he intended to represent himself. He argued that there was no assurance of confidentiality with standby counsel. Also, he stated that he would represent himself because he could not sign the financial affidavit.

Another hearing concerning the issue of counsel was conducted on May 11, 1994. The court informed Mr. Veatch that under the Criminal Justice Act, he was presumptively entitled to court-appointed counsel and other services at government expense, and that this presumption would be indulged to the extent possible. The court summarized the allegations against Mr. Veatch, the alleged statutory violations, and the maximum potential punishment he could receive. The court told Mr. Veatch that he would be at an extreme disadvantage without counsel because he did not have personal access to a law library and because he could not personally investigate his case due to his incarceration. The court told him he was proceeding in a complex area where professional training and experience are desired and that

28

an attorney could be aware of potential defenses that he had not considered. He was told that through standby counsel he could access a law library, legal materials, legal advice, legal procedures, and an understanding of defenses available in the case.

On May 12, 1994, Mr. Veatch filed a document entitled "Advice to the Court." There, he stated, "Ronald Veatch accepts the advice tendered by the Court on the perils of self representation, desires to represent himself in this matter with the assistance of stand-by counsel." (R., Doc. 193).

The record reveals that the trial court did ensure that Mr. Veatch was aware of the nature of the charges against him, that he knew the statutory violations of which he was accused, and that he was aware of the maximum sentences for the crimes with which he had been charged. The court also recognized that Mr. Veatch was aware of some defenses to the charges against him, and the court further advised him that counsel could assist him with defenses which he had not already considered.

The questioning of Mr. Veatch by the district court, the advise it gave him, the availability of standby counsel, his prior experience with the criminal justice system, the pleadings he filed in this case, and his performance at trial support our conclusion that Mr. Veatch made a knowing, intelligent, and voluntary waiver of his Sixth Amendment right to counsel.

VIII. The Jury's Note Regarding Procedures for Filing a Complaint

29

Defendant Veatch next claims that he was denied a fair trial when the district court failed to inquire about jury coercion after receiving a communication from the jury. We review a district court's denial of a motion for a new trial premised on allegations of juror bias or misconduct for an abuse of discretion. United States v. Bradshaw, 787 F.2d 1385, 1390 (10th Cir. 1986). In Bradshaw, we explained:

> "A trial court has a great responsibility and wide discretion in dealing with a motion for a new trial based on allegations of juror misconduct. . . . The trial judge's response to such a motion must be guided by the content of the allegations, including the seriousness and likelihood of the alleged bias, and the credibility of the source. . . . Something more than an unverified conjecture is necessary to justify the grant of a new trial where only potentially suspicious circumstances are shown. . . . And even where juror bias is shown, not every incident requires a new trial."

Id. (quoting United States v. Jones, 707 F.2d 1169, 1173 (10th Cir.), cert. denied, 464 U.S. 859 (1983)) (citations omitted).

During deliberation, the jury sent two notes to the judge at the same time. The first stated that the jury was hopelessly deadlocked on four of the nine counts and that further deliberation would serve no purpose. The second note reads: "The jury would like to know what it can or cannot discuss or reveal to anyone after we are dismissed. Also is there a procedure for filing a complaint regarding the deliberation proceedings." (R., doc. 372). In response to the notes, the court gave the jury an Allen instruction. Just prior to the jury returning to the courtroom with its verdict, Mr. Veatch made an oral motion for a mistrial because of the note. He interpreted the note to mean that a juror had a fear of physical harm, fear of threat, or that it was an indication of coercion.

30

The court denied the motion for mistrial based on a different interpretation of the note. In response to Mr. Sealander's objection to the proposed <u>Allen</u> instruction, the court stated that an <u>Allen</u> charge was appropriate because the second note indicated that the jurors were complaining about the jury deliberations and they were hopelessly deadlocked. In response to Mr. Veatch's concern, the court stated that it would poll the jury. After the jury provided its verdict, the court did poll the jury, and all jurors indicated that the verdicts were their own.

The cases cited in Mr. Veatch's counseled brief are inapplicable because they concern unauthorized contacts with jurors. There is no evidence of unauthorized contacts, and we do not believe the second note can reasonably be read to mean that someone had unauthorized contact with a juror. Mr. Veatch asserts that the court should have immediately conducted an inquiry into the "complaint." Under the circumstances, however, we agree with the court's decision not to immediately inquire into the second note because a trial judge's interference with the jury's deliberations should be minimized. By inquiring into the "complaint" at the same time as the <u>Allen</u> instruction, the court itself may have been unduly coercive. The trial court reasonably interpreted the second note to mean that the jurors were engaged in heated deliberations. The trial court properly handled the situation by refusing Mr. Veatch's motion for a mistrial and polling the jury about its verdict. There was no indication during the polling that any of the jurors were coerced, forced, or threatened into their verdict. Hence, the district court did not abuse its discretion in denying Defendant Veatch's motion for a mistrial.

IX. Mr. Veatch's Removal from the Courtroom During Sentencing

Defendant Veatch next claims the court unconstitutionally removed him from the courtroom during sentencing. This issue constitutes a mixed question of law and fact which we review de novo. United States v. Gomez, 67 F.3d 1515, 1528 (10th Cir. 1995), cert. denied, 116 S. Ct. 737 (1996). A defendant has a right to be present at all critical stages of a criminal proceeding, including sentencing. Fed. R. Crim. P. 43(a); see United States v. Behrens, 375 U.S. 162, 165-66 (1963).

During sentencing, the court was speaking with Mr. Coyle, who appeared as counsel for Mr. Veatch for purposes of sentencing, about Mr. Veatch's financial situation. During the conversation, Mr. Veatch interrupted, and the following colloquy occurred:

> The Defendant: Oh, please. Would you mind getting me out of here.
> The Marshal: Sit down.
> The Court: Please remove Mr. Veatch. Mr. Veatch, Mr. Veatch, do you wish
> to be present at sentencing?
> The Defendant: I don't want to listen to any more of your crap, Judge.
> The Court: Remove Mr. Veatch from the courtroom. He may be returned to the
> holdover. You will be sentenced in your absence, Mr. Veatch.
> The Defendant: No, I won't. Not by a legitimate judge but by a bribe-taking
> [expletive deleted].

(R., Veatch Sentencing Tr. at 13-14 (Jan. 6, 1995)).

Defendant asserts that his removal was unconstitutional because he "was not adequately warned by the district court that further outbursts would lead to his immediate removal from the sentencing hearing." Appellant Veatch's Br. at 28. Defendant correctly states that a defendant may waive his right to be present if he persists in disruptive conduct

32

after being warned by the court that such conduct will result in his removal. Fed. R. Crim. P. 43(b)(3); Illinois v. Allen, 397 U.S. 337, 343 (1970). This case, however, does not involve removal after repeated disruptive conduct--although it is indisputable that Mr. Veatch was being disruptive in the courtroom. Rather, Mr. Veatch made an explicit request to leave the courtroom: "Would you mind getting me out of here." The court verified Mr. Veatch's intent to be absent during sentencing by asking: "Mr. Veatch, do you wish to be present at sentencing?" Mr. Veatch responded that he did not want to be present by saying: "I don't want to listen to any more of your crap, Judge." Under the circumstances, the Defendant was not forcefully removed; rather, Mr. Veatch knowingly and voluntarily waived his right to be present during his sentencing hearing.

X. Mr. Veatch's Two-Level Increase for Obstruction of Justice

Defendant Veatch claims the court erred in imposing a two-level increase in his sentence for obstruction of justice. Our review is a three-step process if a district court makes an upward departure from the Sentencing Guidelines. United States v. White, 893 F.2d 276, 277-78 (10th Cir. 1990). First, we make a de novo review of whether the circumstances cited by the district court justify a departure. Id. If a departure is warranted, then we review the underlying factual determinations for clear error. Id. Finally, we review the degree of departure for reasonableness. Id.

33

The Sentencing Guidelines provide: "If the defendant wilfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice during the investigation, prosecution, or sentencing of the instant offense, increase the offense level by 2 levels." U.S.S.G. § 3C1.1 (Nov. 1, 1994). The sentencing commentary to § 3C1.1 includes examples of obstruction of justice, such as the "threatening, intimidating, or otherwise unlawfully influencing a co-defendant, witness, or juror, directly or indirectly, or attempting to do so." U.S.S.G. § 3C1.1, n. 3(a). In imposing the upward departure for obstruction of justice, the court stated:

> Mr. Veatch, as is certainly made obvious by his recent conduct and removal from the courtroom, has been a difficult defendant. This has been an extraordinarily difficult case to conduct pursuant to the rules of procedure in this court.
>
> The Sentencing Guidelines permit me to depart in circumstances in which the particular facts or factors either are not considered by the guidelines or present a degree of conduct in excess of that which is ordinarily involved. This is the kind of conduct but not the degree of conduct that is contemplated by the Sentencing Commission and contained within these guidelines. Specifically I find that, as I mentioned earlier, Mr. Veatch has threatened, intimidated or otherwise attempted to unlawfully influence in this case not only his co-defendant but everyone including the judge, the prosecutors, the law enforcement officers, the U.S. Marshals, the probation officer involved in his presentence report, the jailers in the county jail where he is serving detention and his appointed counsel as well as his co-defendant's appointed counsel. Mr. Veatch has made threats to everyone of those persons or every class of persons including more than one in many classes. He has threatened or filed lawsuits, none of which to my knowledge have ever been served on anyone. He has, in effect, attempted to bring the system of justice, as it operates in this district, to a complete halt through his tactics of, for instance, filing endless and repetitive pleadings even after receiving rulings which clearly apply to the next-filed pleadings. He has taken inconsistent positions, for example, with respect to the issue of his competency; claiming that he was competent and then wishing to appeal a finding of competency; complaining about delays and requesting additional delays; complaining because hearings were scheduled on motions that he had filed. He has, in effect, testified at

34

> the trial of this action without having been placed under oath or subjecting himself to cross-examination through his questions and statements to the jury and to witnesses during trial.

(R., Veatch Sentencing Tr. at 16-17 (Jan. 6, 1995)). The court specifically found that Mr. Veatch had threatened, intimidated or otherwise attempted to unlawfully influence his co-defendant, the judge, the prosecutors, the law enforcement officers, the U.S. Marshals, the probation officer involved in his presentence report, the jailers in the county jail where he was serving detention and his appointed counsel as well as his co-defendant's appointed counsel. The circumstances cited by the district court justified an upward departure for obstruction of justice pursuant to § 3C1.1.

After reviewing the record, we conclude that the district court was not clearly erroneous in its finding that Mr. Veatch had threatened, intimidated, or otherwise attempted to unlawfully influence those involved in his prosecution. Mr. Veatch filed numerous civil complaints containing an endless stream of pejorative and scandalous allegations involving Justices, judges, the grand jury, law enforcement agencies, the case agent, the victim of Mr. Veatch's scam, three prosecution witnesses, and the prosecutor. Mr. Veatch forced the recusal of one judge and attempted to force the recusal of the judge who presided over this case by including them in these patently frivolous lawsuits, which included allegations that were materially false and utterly absurd. Mr. Veatch challenged payment of court-appointed

attorneys and filed a state bar complaint against his standby counsel. Numerous pleadings[7] filed by Mr. Veatch contained unfounded allegations of sexual misconduct and other types of improprieties by parties to the case.

Defendant Veatch contends that he was not acting willfully to obstruct justice, but was just defending himself. On the contrary, the record reflects a concerted effort by Mr. Veatch to threaten, intimidate, and unlawfully influence those involved in his criminal prosecution by abusing and misusing the legal process. Given Mr. Veatch's flagrant attempt to obstruct justice, we conclude the two-level upward departure was reasonable.

We conclude that the circumstances justified a departure from the Guidelines, the supporting factual findings cited by the court were not clearly erroneous, and the two-level upward departure was not unreasonable.

## XI. Defendant Veatch's Ability to Pay Restitution

Defendant Veatch claims the court improperly ordered him to pay $96,5762.99 in restitution when there was no evidence of his ability to pay. We review the factual findings underlying a court's order to pay restitution for clear error. United States v. Mitchell, 15 F.3d 953, 958 (10th Cir. 1994). A restitution order "must be consistent with a defendant's ability to pay." United States v. McIlvain, 967 F.2d 1479, 1481 (10th Cir. 1992); see also 18 U.S.C.

---

[7] Mr. Veatch filed approximately 150 pleadings, the majority of which were filed in bad faith and served no purpose other than to hinder and delay the prosecution of his case.

§ 3664 (stating that the court shall consider "the financial resources of the defendant" in determining whether to order restitution).[8]

Mr. Veatch repeatedly refused to supply financial information to the court. Evidence presented at trial showed that Mr. Veatch had lived a sumptuous lifestyle prior to being arrested. At the time he was arrested he had a Cadillac automobile; his house was located in a high-income residential neighborhood; his house was approximately 5,000 square feet in size; the house had a guest house, a pool house, and servants' quarters; and the house was purchased for $325,000 in June 1992 with Mr. Veatch making a $75,000 cash down payment on the house. Also, Mr. Veatch owned a company called Service Corporation of America, Inc.; it was run by Mr. Veatch using the alias name Franklin; and the company had checking accounts at two different banks in Texas. The record shows Mr. Veatch led a luxurious lifestyle just prior to his arrest, the uncontested amount of the victim's loss was $96,572.99, and he had failed to cooperate with the probation officer in providing financial information. Therefore, the trial court properly ordered Mr. Veatch to pay restitution. As explained above, however, we are vacating and remanding the restitution orders of Mr. Veatch and Mr.

---

[8]     This statute was amended April 24, 1996, and it now provides: "In each order of restitution, the court shall order restitution to each victim in the full amount of each victim's losses as determined by the court and without consideration of the economic circumstances of the defendant." 18 U.S.C. § 3664(f)(1)(A). The amendment appears to modify the standard for reviewing a defendant's ability to pay. Our review in this case, however, is limited to the sentence imposed on the Defendant by the district court prior to the amendment.

Sealander because restitution was ordered in an amount greater than the total loss to the victim.

XII. Mr. Veatch's Opportunity to Present a Defense

Defendant Veatch claims the court erred by not allowing him the opportunity to present a defense. We review the trial court's evidentiary rulings for an abuse of discretion, and we will not overrule the trial court's evidentiary rulings unless we have a definite and firm conviction that the trial judge made a clear error of judgment. United States v. Gonzales-Acosta, 989 F.2d 384, 388-89 (10th Cir. 1993). We generally will defer to the judgment of the trial court because it has the advantage of viewing the witnesses and assessing the credibility and probative value of offered evidence. Id. at 388.

In this claim, Mr. Veatch asserts that he was unconstitutionally denied the opportunity to present a defense. Mr. Veatch informed the court that he intended to call approximately 800 witnesses, and the court correctly responded that he could not call witnesses whose testimony would be cumulative. Limitations exist to a defendant's right to testify and to call witnesses in his favor under the Fifth and Sixth Amendments. See Chambers v. Mississippi, 410 U.S. 284, 295 (1973). Both the accused and the government must comply with established rules of procedure which are designed to promote fairness in the trial. Federal Rule of Evidence 403 permits a court to exclude relevant evidence which would be a waste

of time or cumulative. The district court did not abuse its discretion in placing limits on Mr. Veatch's presentation of witnesses which were in accord with established rules of procedure.

Mr. Veatch also argues that he did not have enough time to prepare for trial because he did not know of the trial date until one week prior to trial. In one of his many motions, however, Mr. Veatch acknowledges that he knew the date of the trial with twelve days advance notice. In an earlier pleading, Mr. Veatch agreed to a continuance of the trial until September 1994. The trial commenced on September 12, 1994, and Mr. Veatch did not have to begin presentation of his defense until September 16, 1994. Mr. Veatch had ample time to prepare his defense and subpoena witnesses for trial.

Additionally, Mr. Veatch claims the court should have allowed him to subpoena witnesses at the government's expense. On May 13, 1994, Mr. Veatch's request to proceed in forma pauperis was granted by the trial court, even though he failed to establish that he was indigent. On August, 5, 1994, he withdrew his prior request to proceed in forma pauperis because he did not want to disclose financial information about himself. A defendant cannot proceed in forma pauperis unless he first establishes a financial inability to pay the required filing fees. See 28 U.S.C. § 1915(a). Thus, this issue is without merit.

XIII. Mr. Veatch's Money Laundering Charge

Defendant Veatch asserts that insufficient evidence supported his conviction for money laundering because the government did not prove that the "transactions were designed

to conceal the nature, the location, the source, or ownership of the control of the funds" pursuant to 18 U.S.C. § 1956(a)(1)(B)(I).[9] Appellant Veatch's Br. at 45. Defendant, however, was indicted and found guilty of violating § 1956(a)(1)(A)(i), which does not include "concealment" as an element. To convict Mr. Veatch of a violation of 18 U.S.C. § 1956(a)(1)(A)(i), the government had to prove that (1) the defendant conducted or attempted to conduct a financial transaction, (2) which the defendant knew involved the proceeds of unlawful activity, (3) with the intent to promote or further unlawful activity. United States v. Torres, 53 F.3d 1129, 1136 (10th Cir.), cert. denied, 115 S. Ct. 2599 (1995).

It is undisputed that Mr. Veatch conducted the financial transactions at issue and that the proceeds of the transactions were from Dion Enterprises's business dealings with Security National Bank. The evidence presented at trial showed that Mr. Veatch used an assumed name and Social Security Number in applying for a credit card merchant account in the name of Dion Enterprises at Security National Bank, a financial institution insured by the FDIC; that he misled Security Bank to believe that Dion Enterprises was a travel agency that would process only sales made by its employees; that the credit card merchant account for Dion Enterprises was approved on the basis of his false statements; that approximately $151,000 of credit card sales not made by Dion Enterprises's employees were deposited into the Security National Bank account; that Security National Bank lost $96,000 from

---

[9]     We set forth the standard of review for a sufficiency of the evidence issue in Part II.

chargebacks resulting from unauthorized sales credited against the Dion Enterprises's merchant account; that Mr. Veatch again used an assumed name and Social Security Number to open a checking account at Central Bank in the name of Dion Enterprises; that twice Mr. Veatch conducted monetary transactions that transferred funds obtained from the unauthorized credit card charges against the merchant account at Security National Bank to the Dion Enterprises's account at Central Bank; and that the transferred funds were used to promote or further fraudulent activity by paying salaries, rent, and other miscellaneous business expenses of Dion Enterprises. Clearly, there was sufficient proof from which a reasonable jury could find Mr. Veatch guilty beyond a reasonable doubt of money laundering in violation of 18 U.S.C. § 1956(a)(1)(A)(i).

XIV. Bias of the Trial Judge

Defendant Veatch claims the trial judge should have disqualified herself from Mr. Veatch's trial. Prior to the first competency hearing, Mr. Veatch filed a motion to have Judge Cauthron recuse herself, which the judge refused to do. See United States v. Veatch, 842 F. Supp. 480, 481 (W.D. Okla. 1993). We review a denial of a motion to recuse under 28 U.S.C. § 455(a) for an abuse of discretion. United States v. Cooley, 1 F.3d 985, 994 (10th Cir. 1993), cert. denied, 115 S. Ct. 2250 (1995). A federal judge should recuse pursuant to 28 U.S.C. § 455(a) if there are grounds to question the judge's impartiality. See Liljeberg v. Health Servs. Acquisition Corp., 486 U.S. 847, 861 (1988).

41

Mr. Veatch argues that Judge Cauthron's impartiality was called into question after he filed a civil lawsuit against her for racketeering, obstruction of justice, conspiracy to murder Mr. Veatch, kidnaping and extortion, and other criminal conduct. The allegations in the complaint were unsubstantiated and facially frivolous. In short, Mr. Veatch's suit was an attempt to disqualify all federal judges in the Western District of Oklahoma from sitting on his criminal case. In the civil action he named all six district court judges for the Western District of Oklahoma, but Judge Cauthron's name did not appear in the body of the civil complaint. Judge Cauthron correctly denied the recusal motion after finding it was merely an attempt to obtain the forum and judge of his choice. See Veatch, 842 F.2d at 481.

XV. Refusal to Suppress Evidence in Mr. Veatch's Trial

Defendant Veatch claims the court erred in failing to suppress evidence found when he was arrested. In reviewing a ruling on a motion to suppress evidence, we examine factual findings for clear error and conclusions of law for reasonableness under the Fourth Amendment. United States v. Little, 18 F.3d 1499, 1503 (10th Cir. 1994) (en banc).

Federal agents went to Mr. Veatch's residence to execute arrest warrants for Messrs. Veatch and Sealander. When Mr. Veatch was arrested, he was observed through a window in a locked room. As agents attempted to break down the door, Mr. Veatch fled out a backdoor where he was apprehended by another agent. As Mr. Veatch exited the backdoor, the agents entered through the front door. The agents testified that they observed in plain

view a credit card holder containing numerous credit cards as they moved through the room in pursuit of Mr. Veatch. Objects in plain view can be seized if the agents seizing the evidence had a right to be in the place where they observed the objects and the objects have an incriminating character that is immediately apparent. Horton v. California, 496 U.S. 128, 134-36 (1990). The agents in this case had a right to be in Mr. Veatch's room pursuant to his arrest warrant, and the credit cards were of an immediately apparent incriminating nature given the credit card/bank fraud charges on which Mr. Veatch was arrested. Thus, we agree with the district court's ruling that the government agents found the credit cards in plain view during the lawful execution of an arrest warrant.

XVI. Issues Raised in Mr. Veatch's Pro Se Brief

In addition to the counseled brief filed on behalf of Mr. Veatch, he filed an independent pro se brief that raises an additional fifty issues for us to consider. We have reviewed Mr. Veatch's pro se brief, liberally construing the issues he raises because he is representing himself. See Haines v. Kerner, 404 U.S. 519, 520 (1972). Most of the issues that he raises are either duplicative of issues that we have already addressed or they are facially meritless. For example, some of his issues read:

> SPR #1    The district court was erroneous in ordering exclusion of CIA/AK4 spy operations that would have proven Dion Enterprises as a CIA asset at the start of the trial and without advance notice to Veatch was clearly erroneous, as it denied Veatch of his defense in chief, and without any trial strategy and defense.
> . . . .

43

SPR #26    Judges Cauthron and Alley were both clearly erroneous in accepting between $1 million to $5 million in money (bribes) from Sir Run Run Shaw, who is the CIA asset front for Asia. Veatch had been general counsel to Shaw and his $60 billion worldwide CIA/AK4 operations that dealt directly in worldwide crime, i.e. murder, drugs, treason, and much more. The multi-billionaire Shaw family is the richest family in Asia and basically controls Singapore and Hong Kong and S.E. Asia, to blow the whistle on the Shaw/CIA/AK4 criminal operation, in which Veatch's CIA/M16 partner, wife, and 3 children were murdered by the CIA/Mossad in November, 1992.

. . . .

SPR # 31    The government was vendictive [sic] and outrageous in forcing Veatch to sleep next to a steel door that slammed at least 500 times a day, 24 hours a day, thereby, denying Veatch sleep and causing Veatch to be competent [sic] and or totally mentally and physcially [sic] ill prior to trial and at sentencing.

. . . .

SPR # 43    Double jeopardy as an issue to vacate.

Appellant Veatch's Pro Se Br. at A, H, M. Many of the "issues" raised by Mr. Veatch are unsupported, conclusionary, argumentative statements, and they are incomprehensible even when liberally construed. We will address the following issues, however, which appear to have some merit when liberally construed.

In issues nine and nineteen Mr. Veatch argues the court violated his Sixth Amendment right to represent himself by forcing him to have stand-by counsel. The court appointed Mr. McCormick to serve as stand-by counsel at Mr. Veatch's trial, and it granted Mr. Veatch's request to have Mr. Coyle appointed to serve as Mr. Veatch's counsel for his sentencing. As explained above, Faretta recognized a defendant's Sixth Amendment right of self-representation. A defendant's right to appear pro se, however, does not prohibit a court from appointing stand-by counsel or the unsolicited participation of stand-by counsel. McKaskle v. Wiggins, 465 U.S. 168, 176-77 (1984). Like Wiggins, Mr. Veatch's complaint is directed

44

at the presence of and unsolicited participation of counsel. Id. at 176. "In determining whether a defendant's Faretta rights have been respected, the primary focus must be on whether the defendant had a fair chance to present his case in his own way." Id. at 177.

Mr. Veatch specifically complains that "Bozo McCormick constantly interfered with Veatch at his trial by sitting next to Veatch so the jury could clearly see the hostility between Bozo McCormick and Veatch." Pro Se Veatch's Br. at C. In Wiggins, the Court refused to categorically bar the participation of stand-by counsel before the jury. 465 U.S. at 182. The assistance provided by Mr. McCormick to Mr. Veatch is very similar to that provided by stand-by counsel to the defendant in Wiggins. Mr. McCormick sat at the defense table with Mr. Veatch; he appears to have stayed in the background because his name rarely appears in the trial transcript; and he informed the court that although Mr. Veatch would not communicate with him, he would continue to make himself available to Mr. Veatch for legal advice and research. It appears from the record that any disputes between Mr. Veatch and his stand-by counsel were kept outside the presence of the jury. For example, Mr. Veatch filed numerous unfounded complaints with the bar against Mr. McCormick. Mr. Veatch alleged that Mr. McCormick was assisting the prosecution. Near the end of the trial, Mr. Veatch requested to put Mr. McCormick on the stand as a witness to question him about the fairness of the trial and about whether he was assisting the prosecution. The court denied Mr. Veatch's request, stating that Mr. McCormick's presence in the hall outside the courtroom was to smoke, not to engage in secret communications with the prosecution. As in Wiggins,

Mr. McCormick's involvement was irreproachable under the circumstances; it did not interfere with Mr. Veatch's actual control over his defense; and it cannot reasonably be viewed as undermining Mr. Veatch's appearance before the jury in the status of a pro se defendant.

In issue ten, Mr. Veatch claims the court violated his right to have court-appointed expert witnesses and a private investigator. Prior to trial, Mr. Veatch filed several motions requesting court-appointed expert witnesses and investigators to investigate his claim of a government conspiracy. The district court denied the motions. We review the court's denial of a defendant's motion to appoint an investigator or an expert for abuse of discretion. Matthews v. Price, 83 F.3d 328, 335 (10th Cir. 1996) (citation omitted). A defendant requesting appointment of an investigator or expert bears the burden of demonstrating with particularity that he is indigent and that "'such services are necessary to an adequate defense.'" Id. (citation omitted). Mr. Veatch repeatedly refused to provide financial information to show that he was indigent, and the reason for his request--to investigate and testify about his conclusory assertion that he was the subject of a CIA conspiracy--did not show that the services were necessary to an adequate defense. We conclude that the court did not abuse its discretion in denying Mr. Veatch's request for court-appointed expert services.

Mr. Veatch argues in issue seventeen that he was denied a fair trial because the jury contained a social security employee when one of the charges against him was for the

46

fraudulent use of a social security number. During voir dire, the court asked whether the jurors or their family worked for the federal government, and one juror responded that she worked as a claims representative for the Social Security Administration. The court informed her that the case involved a charge that a social security number had been fraudulently used, and it asked whether given her employment she would be fair and impartial. The juror responded that she could serve impartially. Mr. Veatch did not object to the presence of the Social Security Administration employee on the jury. In a similar case, the Ninth Circuit Court of Appeals has held that a trial court was not required to exclude a postal service employee from a jury in a mail fraud case, based on a claim that it could be presumed the employee would be biased. United States v. Plache, 913 F.2d 1375, 1378 (9th Cir. 1990). The mere fraudulent use of a social security number does not make all employees of the Social Security Administration biased. After investigation by the court, there was no evidence that even a remote relationship existed between the juror's duties as a claims representative and the government's investigation of Mr. Veatch. We conclude that Mr. Veatch's right to a fair trial by an impartial jury was not violated under the circumstances of his case.

In issue twenty-four, Mr. Veatch claims the court erred by not permitting him to make objections to the Presentencing Report. A review of Mr. Veatch's sentencing hearing transcript during the period prior to when he requested to be removed shows that this claim is meritless. Mr. Veatch filed several motions challenging his sentencing and the

47

presentencing report. Prior to sentencing Mr. Veatch had the opportunity to review the final presentencing report, and he was provided an opportunity during sentencing to object to the final report.

Mr. Veatch claims in issue twenty-seven that the court erred in not ordering a severance of trials. Generally, "persons indicted together are tried jointly." United States v. Martinez, 76 F.3d 1145, 1152 (10th Cir. 1996). "A defendant must show actual or threatened deprivation of his right to a fair trial" in seeking severance. Id. Neither Messrs. Veatch nor Sealander requested a severance of trial prior to trial. Thus, this claim has no merit.

In issue forty-six Mr. Veatch argues that the district court erred in refusing to allow him to inform the jury that they could nullify the law. The court did prohibit Mr. Veatch from arguing to the jury that it could nullify the law in the following exchange:

> Mr. Veatch: There's little to add except to provide you that the U.S. Constitution is the supreme law of the land. The Bill of Rights and the U.S. Constitution I believe in with all my heart. I love what's left of our Constitution. You have the power to either go ahead and give me to these people. [sic] There's no doubt in your mind take [sic] they're my enemy. That's been testified to. You have the power as jurors to nullify any law--
> Mr. Borden: I object to the arguments, Your Honor. That is not the law and it's contrary to the instruction of this Court.
> The Court: Sustained.
> Mr. Veatch: You have the right to vote your conscience, to judge both facts and law. When you leave here today to go make your decision, I hope you'll look at me as a human being and not like one of them.

(R., Vol. V at 900). Although Mr. Veatch disregarded the court's order and continued with his improper argument, the court's order was correct. Neither a judge nor a party can

48

encourage a jury to disregard the law.  See United States v. Grismore, 546 F.2d 844, 849 (10th Cir. 1976) (holding that a criminal defendant is not entitled to have the jury instructed that they could disregard the law); United States v. Trujillo, 714 F.2d 102, 106 (11th Cir. 1983)(holding that defense counsel may not argue jury nullification during closing argument).  Thus, the court did not error in prohibiting Mr. Veatch's argument to the jury that it could disregard the law.

The convictions and sentences of Defendants Veatch and Sealander are **AFFIRMED.** The restitution orders against Defendants Veatch and Sealander are **VACATED**.  The cases of  Messrs. Veatch and Sealander are **REMANDED** for resentencing consistent with this opinion.

Entered for the Court

Michael R. Murphy
Circuit Judge

49